IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MI SOOK LEE and DONGHOON SHIN,

Plaintiffs,

v.

SERBAN RUSU, ESTATE OF SERBAN RUSU, and KYOKO RUSU,

Defendants.

No. C 17-01110 WHA

**ORDER DENYING MOTION TO DISMISS**

**INTRODUCTION**

In this action for breach of contract and misrepresentation in connection with a failed purchase agreement, defendants move to dismiss. The motion is **DENIED**.

**STATEMENT**

This action arises out of a contract dispute between two families over the failed purchase of a valuable violin crafted by Tommaso Balestrieri of Mantua in 1765. The following statement of facts is taken from the well-pled allegations of the complaint (Dkt. No. 1).[1]

Plaintiffs Donghoon Shin and Mi Sook Lee are husband and wife, respectively, and hail from Korea. In 2000, Donghoon worked at the University of California, San Francisco, on a

---

[1] Tommaso Balestrieri was a celebrated and prolific luthier who worked in the city of Mantua in northern Italy during the eighteenth century. On March 31, 2015, a Balestrieri violin dated from 1765 sold in an auction at Sotheby's, London, for £420,000 (approximately $620,000 at the time), setting a new auction record for Balestrieri instruments. *See A Violin by Tommaso Balestrieri, Mantua, circa 1765*, INGLES & HAYDAY, http://ingleshayday.com/a-violin-by-tommaso-balestrieri.html.

visa good for one year. During that year, he lived in the United States with Mi Sook and their seven-year-old daughter, Yoomin Shin, both of whom held derivative visas (*id.* ¶¶ 1, 3).

Yoomin had played the violin since she was three years old. While in the United States, plaintiffs sought a violin instructor for her and located defendant Serban Rusu through the UCSF website. Serban began teaching Yoomin at a starting rate of $85 per hour, and rented one of his violins to her for $50 per month because he thought hers "was too large" (*id.* ¶ 2).[2]

Within their first two months together, Serban showed Yoomin his Balestrieri violin and told her it "was a very good violin." Soon after, Serban began telling Mi Sook that "Yoomin was a very smart student, and if she were his daughter, she would be famous." On one such occasion, Serban offered to sell the Balestrieri to Mi Sook. She declined because she did not have the money to buy the violin, and in any case "Yoomin was too young for such a violin because [it] was full size." Nevertheless, Serban "continued on a regular basis to try to persuade [Mi Sook] to buy the Violin" (*id.* ¶¶ 3–5).

Mi Sook hoped for Yoomin to eventually study music at the Juilliard School and at some point told Serban of this aspiration. Serban responded that it would be better for Yoomin to study at the Curtis Institute of Music. In August 2001, when Serban learned that Yoomin's family would return to Korea, he asked plaintiffs to allow her to stay in the United States with him and his wife, defendant Kyoko Rusu. Serban claimed he had a "special musical program that would help make Yoomin a great violinist." The parties agreed that Yoomin would return to the United States during Christmas and summer breaks to attend Serban's program at the cost of two thousand dollars per month. Yoomin did so from January 2002 until she started high school in Michigan in the fall of 2007. While in high school, she continued to study violin. During breaks, she lived with defendants and continued her lessons with Serban (*id.* ¶¶ 6–7).

Meanwhile, starting in the summer of 2002, Kyoko attempted to persuade Mi Sook to purchase the Balestrieri, "telling her that it would be hard to find another violin, and the Violin would be good for Yoomin." Mi Sook initially resisted but eventually began to believe that the

---

[2] According to the complaint, Serban passed away in June 2015 (Dkt. No. 1 ¶ 29). According to the motion to dismiss, "there is no estate," so defendants have asked plaintiffs to remove Serban and the "non-existent estate" as named defendants (Dkt. No. 19 at 2 n.1). It is unclear whether plaintiffs intend to do so.

2

Balestrieri "would have more meaning to [Yoomin] because it was owned by a teacher" and in "Korean culture, teachers are highly respected and hold a position of great trust" (*id.* ¶¶ 8–9).

Here the timeline set forth in the complaint takes some perplexing turns. According to the complaint, in 2004, Serban convinced Mi Sook to buy a different violin for Yoomin from a friend of his for twenty thousand dollars. Meanwhile, "[o]n or about early 2004," plaintiffs allegedly agreed to purchase the Balestrieri for half a million dollars. In "approximately January 2005," however, Mi Sook discussed purchasing the Balestrieri with Donghoon. He initially opposed the idea, but she persuaded him to go along with the purchase because the Balestrieri "was owned by Serban . . . a teacher of great prestige, and it would enhance Yoomin's career." Then, "[o]n or about November 2005," plaintiffs gave Kyoko one hundred thousand dollars "as a down payment on the purchase price" of the Balestrieri. "There was no discussion or agreement as to how and when to make the down payment, nor with respect to payment of the balance of the purchase price," except that Mi Sook told Kyoko "she would try to periodically send Defendants further monies." The parties did not enter into any written contract for the purchase, and defendants kept possession of the Balestrieri. Additionally, in 2006, Serban allegedly sold Mi Sook "a full-size violin for Yoomin" (ostensibly different from the Balestrieri) for twenty-five thousand dollars (*id.* ¶¶ 10–15).

Over the next "approximately three years," plaintiffs paid defendants another $157,000. In 2009, Serban told Yoomin she was "old enough" to take possession of the Balestrieri. The complaint alleges, inconsistently, that Yoomin turned eighteen both in 2009 and in 2010. Since Yoomin was allegedly seven years old in 2000, this order assumes she turned eighteen in 2010. In any case, Yoomin then decided she did not want to become a violinist and did not want the Balestrieri. Mi Sook relayed Yoomin's change of heart to Kyoko and asked her to find another buyer for the Balestrieri. Kyoko said she needed time to think about Mi Sook's request. On May 10, 2011, Kyoko told Mi Sook that she had spoken with Serban and "they would change their 'financial plan' and repay Plaintiffs, either with periodic payments similar to those Plaintiffs made . . . or, depending on the finances of Serban Rusu's company, a larger sum. Plaintiffs accepted this offer" (*id.* ¶¶ 16–19).

On November 4, 2011, Serban wrote Mi Sook to say "that he was glad that he did not have to part with the Violin, and the best way to resolve the payment details was for everyone to discuss the matter when [Mi Sook] next came to the United States." On December 2, 2011, Mi Sook responded that "she had respected and put her trust in [Serban], and she could not understand why he had tried to sell the Violin to Yoomin, who was so young." Mi Sook added "that she and her husband had to borrow the money for the violin payments and they [were] still paying 4.5 percent interest every year" (*id.* ¶¶ 20–21).

The parties continued to "negotiate the details of the repayment" until November 10, 2013, when Mi Sook wrote Kyoko "that almost three years had passed since Defendants had promised to repay Plaintiffs the monies paid toward the Violin, [yet] there had been no 'specific' method of repayment agreed upon." On March 3, 2014, Kyoko responded that she had "not been well for several months." On April 14, Mi Sook replied that "she believed [Kyoko] was putting her off," that she had asked Kyoko for an IOU in November 2013, and that she had yet to receive said IOU. Kyoko replied the same day that "she had been in Tokyo attending to her mother [and] that when she returned to the United States, she was not well, and therefore was not able to discuss the repayment terms" (*id.* ¶¶ 22–26).

On July 7, Mi Sook again wrote Kyoko "that she still [had] not heard from her concerning repayment." On July 22, Kyoko responded by letter "that her mother's health condition was not good, and that she had decided to hire a lawyer to represent her and her husband with respect to the Violin matter." Kyoko's letter also said "the sale of the Violin to Plaintiff[s] was part of their 'financial plan' for their old age" (*id.* ¶¶ 27–28).

Plaintiffs' nine-page complaint does not explain how the foregoing communications occurred and does not append any copies thereof. The complaint also alleges that the parties signed a "tolling agreement" on June 25, 2015, but does not append the agreement (*id.* ¶ 30).

Based on the foregoing allegations, plaintiff asserts claims for relief for (1) "promise with no intent to perform" with "exemplary damages in a sum to be proven at trial," (2) "rescission of contract and novation" with attendant damages of approximately $270,000, and

4

(3) declaratory relief to "determine the timeframe and amount of repayment of the monies paid by Plaintiffs to Defendants" (*id.* at 6–8).

Defendants now move to dismiss all three claims (Dkt. No. 19). This order follows full briefing and oral argument.

**ANALYSIS**

1.  **SCOPE OF THE PLEADING.**

As a preliminary matter, the scope of the pleading on this motion requires clarification. Defendants' motion to dismiss includes a declaration from Kyoko that appends two email chains between the parties from 2011. The first chain includes emails dated June 19, June 26, July 10, and July 15, although the declaration mentions only the latter two. The second chain includes emails dated November 4 and December 1, both of which are mentioned in the declaration (Dkt. No. 19-1). Although the complaint did not append any of these emails, defendants contend "The Court may nonetheless consider [them] because Plaintiffs' Complaint relies upon them and their authenticity is not in question" (Dkt. No. 19). Plaintiffs do not object and actually rely on Kyoko's declaration and its appended emails several times in their opposition brief (*e.g.*, Dkt. No. 21 at 8–9).[3]

"When ruling on a motion to dismiss, [courts] may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008) (quotation and citations omitted). Courts may also consider documents not physically attached to the plaintiff's pleading if they are incorporated by reference, *i.e.*, their contents are alleged in the complaint and no party questions their authenticity. *Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1043 (9th Cir. 2015) (citations omitted).

Here, it seems no party questions the authenticity of any email appended to Kyoko's declaration. The complaint, however, does not clearly refer to the June 19, June 26, or July 15 emails. It does refer to a representation by Kyoko to Mi Sook on May 10, which clearly tracks the July 10 email (*compare* Dkt. No. 1 ¶ 19 *with* Dkt. No. 19-1). Additionally, the complaint

---

[3] The emails refer to Yoomin as "Jenny" and to Mi Sook as "Silvia."

5

refers to a written communication from Serban to Mi Sook on November 4, which clearly tracks the November 4 email (*compare* Dkt. No. 1 ¶ 20 *with* Dkt. No. 19-1). The complaint also refers to a written response from Mi Sook to Serban on December 2, which clearly tracks the December 1 email (*compare* Dkt. No. 1 ¶ 21 *with* Dkt. No. 19-1). This order concludes the discrepancies between the dates are simply more errors in the complaint (*see* Dkt. No. 21 at 12).

The July 10, November 4, and December 1 emails appended to Kyoko's declaration are therefore deemed incorporated by reference and will be considered on the instant motion. The emails dated June 19, June 26, and July 15, on the other hand, have not been incorporated by reference in the complaint and will not be considered on this motion.

### 2. LEGAL STANDARD.

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek*, 519 F.3d at 1030–31. Conclusory allegations or "formulaic recitation of the elements" of a claim, however, are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681.

### 3. PLAINTIFFS' CLAIMS FOR RELIEF.

#### A. "Promise with No Intent to Perform."

Defendants construe this claim for relief as a claim for fraud and move to dismiss it on the grounds that (1) it is "impermissibly vague" such that it fails to satisfy the heightened pleading standard set by FRCP 9(b), and (2) it is time-barred under Section 338(d) of the California Code of Civil Procedure (Dkt. No. 19 at 7–9). Plaintiffs in their opposition brief likewise characterize their first claim for relief as "a subspecies of fraud" and concede that it is subject to the statute of limitations set by Section 338(d) (Dkt. No. 21 at 6). This order agrees with both sides that plaintiffs' claim should be treated as one for intentional misrepresentation and disagrees with defendants that it should be dismissed.

### *(1) FRCP 9(b).*

Under California law, the elements of fraud are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to defraud (*i.e.*, to induce reliance), (4) justifiable reliance, and (5) resulting damage. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004). Here, plaintiffs' complaint closely tracks the foregoing elements, alleging that (1) defendants promised they would refund the money plaintiffs paid for the Balestrieri, (2) defendants had no intent to perform when they made the promise, (3) defendants intended that plaintiffs rely on the promise, (4) plaintiffs reasonably relied on the promise, and (5) plaintiffs suffered harm as a result of defendants' failure to perform (Dkt. No. 1 ¶¶ 32–40). This order therefore construes plaintiffs' first claim for relief as a claim for intentional misrepresentation.

Since plaintiffs' first claim for relief sounds in fraud, FRCP 9(b) applies and requires that plaintiffs "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Averments of fraud must be accompanied by "the who, what, when, where, and how" of the alleged misconduct. *Ibid.* Here, plaintiffs have adequately pled their intentional misrepresentation claim under FRCP 9(b). Defendants' entire argument to the contrary is as follows (Dkt. No. 19 at 9 (citation omitted)):

> Plaintiffs' vague allegation the parties continued to negotiate unspecified payment details for some unspecified period after December 2, 2011, is impermissibly vague. [P]aragraphs 19 through 21 also fail to meet the Rule 9(b) "particularity" standard and also, as shown by the actual emails, omit critical facts.

*First*, defendants' charge of "vagueness" goes only to the terms of the alleged refund agreement between the parties. Even if some details about that agreement remain vague, that does not defeat plaintiffs' well-pled allegations that defendants fraudulently induced their reliance on the purported agreement with no intent to perform. Insofar as defendants' argument disputes formation of the underlying contract, it is addressed below within the context of plaintiffs' second claim for relief. *Second*, contrary to defendants, the allegations in Paragraphs 19 through 21 of the complaint are adequately pled even under FRCP 9(b). *Third*, defendants

7

accuse those paragraphs of omitting "critical facts" but fail to specify what the "critical facts" are, or how omission thereof strips the allegations of requisite particularity.

### *(2) Statute of Limitations.*

Section 338(d) of the California Code of Civil Procedure provides a three-year statute of limitations for actions for relief "on the ground of fraud or mistake." In such cases, the claim for relief "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Generally speaking, a claim for relief accrues at the time it is complete with all its elements. Accrual is delayed, however, until the plaintiff has or should have inquiry notice of the claim. In other words, a plaintiff is required to conduct a reasonable investigation after becoming aware of an injury, and is charged with knowledge of information that would have been revealed by such an investigation. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806–08 (2005). A plaintiff claiming delayed discovery of the facts constituting their claim for relief has the burden of pleading facts to show (1) the time and manner of discovery and (2) their inability to have made earlier discovery despite reasonable diligence. *Applied Med. Corp. v. Thomas*, 10 Cal. App. 5th 927, 940 (2017) (citations omitted).

The complaint here specifically alleges how the two families communicated and negotiated concerning the terms of the purported refund agreement in an apparently cooperative manner until July 22, 2014, when "Plaintiffs had reason to suspect that Defendants had no intent to keep the promise when made" because "Defendants informed Plaintiffs that Defendants were seeking an attorney and that the purported sale of the Violin was part of Defendants [*sic*] financial plan for retirement" (*see* Dkt. No. 1 ¶¶ 28, 37). Construed in the light most favorable to plaintiffs, the complaint sufficiently alleges both (1) the time and manner of discovery and (2) their inability to have made earlier discovery despite reasonable diligence.

Defendants contend the email dated November 4, 2011, should have put plaintiffs on notice that defendants "did not intend to refund Plaintiffs' payments" (Dkt. No. 19 at 8). In that email, Serban said to Mi Sook (Dkt. No. 19-1):

> There are several points we have to discuss.
> Unfortunately, we do not have any more money which we put in
> the system.

United States District Court
For the Northern District of California

> One of the problems is Jenny who did not do anything which I asked.
>
> Misinformation about the violin hurts me.
> This violin is very dear to me, so I am glad I don't have to apart [*sic*] with it.
>
> I think the best way to approach this issue is when you come to US, we should meet and talk.
>
> I am sorry we are in such a mess.

Defendants argue that the foregoing email would have caused "any reasonable plaintiff to suspect that [defendants] did not intend to refund [their] payment," and further argue that "a reasonable person would have insisted upon a partial payment or at least a commitment to a payment schedule before June 26, 2012" (Dkt. No. 19 at 8). These bald assertions merely argue the merits of the case and do not warrant dismissal at the pleadings stage.

Defendants also argue that Mi Sook actually suspected, as of the aforementioned email, that defendants did not intend to refund her money. They point to a single sentence cherry-picked from her lengthy response email to Serban, wherein she said, "now, I am in [a] very complicated situation with you" (*ibid.*). Read in context, however, the meaning of that sentence is ambiguous. The entire email never directly references any refund agreement between the families. Instead, it primarily describes Mi Sook's thoughts on her former hopes for Yoomin's career as a "great violinist" under Serban's tutelage and her confusion regarding Yoomin's choice to stop studying music (*see* Dkt. No. 19-1). Construed in the light most favorable to plaintiffs, the "complicated situation" Mi Sook mentioned could plausibly have referred to the personal and emotional turbulence between the families rather than to any wrongdoing she may have foreseen. Even if, as defendants contend, the email shows that plaintiffs suspected defendants of attempting to breach the purported contract between them, that would still fall short of showing that plaintiffs should have further suspected defendants of fraud in 2011.

Defendants cite *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926 (1994), for the proposition that plaintiffs' claim accrued when they should have suspected that defendants did not intend to refund their money, "regardless of the reasons or [defendants'] intentions at the time the 'promise' was made" (Dkt. No. 22 at 2–3). Actually, the cited part of *Bernson* simply

9

states that "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing." 7 Cal. 4th at 932 (citation omitted). *Bernson* did not question, and in fact expressly reaffirmed, the general principle that the statute of limitations "commences upon the occurrence of the last element essential to the cause of action." *Id.* at 931. This contradicts defendants' suggestion that plaintiffs' intentional misrepresentation claim could have accrued "regardless of" the scienter that forms a necessary element of the claim.

### B. "Rescission of Contract and Novation."

Both sides agree that plaintiffs' second claim for relief is essentially a breach of contract claim (*see* Dkt. Nos. 19 at 9, 21 at 12), although plaintiffs admit in their opposition brief that it is "somewhat unartfully pled" and seek leave to amend (Dkt. No. 21 at 12). According to plaintiffs, the offer and acceptance appear in Paragraphs 18 and 19 of the complaint, respectively (*ibid.*). Those paragraphs, however, state (Dkt. No. 1 ¶¶ 18–19 (emphasis added)):

> 18. After Yoomin turned 18 in 2010, she decided that she did not want to become a violinist, and did not want to own the Violin. Subsequently, [Mi Sook] told [Kyoko] that Yoomin no longer wanted to study the violin, and asked her to find someone else to buy the Violin. [Kyoko] told [Mi Sook] that she needed time to think about [the] request;
>
> 19. On [July] 10, 2011, [Kyoko] represented to [Mi Sook] that she had spoken with [Serban], and that *they would change their "financial plan" and repay Plaintiffs*, either with periodic payments similar to those Plaintiffs made to Defendants or, depending on the finances of [Serban's] company, a larger sum. *Plaintiffs accepted this offer*.

Thus, contrary to plaintiffs, both the alleged offer (by defendants) and alleged acceptance (by plaintiffs) appear in Paragraph 19 of the complaint.

*First*, defendants argue that Kyoko's email to Mi Sook dated July 10 (they mistakenly refer to it as Kyoko's July 15 email) shows no intention to contract, baldly asserting that Kyoko did not "invite acceptance or indicate an agreement to be bound" (Dkt. No. 19 at 9–10). Under California law, however, formation of contract — including mutual assent — is generally a question for the trier of fact. *Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*, 240 Cal. App. 4th 763, 771 (2015). That is the case here, where the factual allegations in the complaint are subject to conflicting interpretations. Defendants fixate on one sentence of

Kyoko's July 10 email, where she said, "let us think how we shoud [*sic*] take care of it" (*see* Dkt. No. 22 at 6). The rest of the email, however, indicated that defendants would refund plaintiffs' money despite their financial difficulties, either "little by little as [plaintiffs] did " or with a "bigger amount" depending on the performance of Serban's company (Dkt. No. 19-1). Thus, construed in the light most favorable to plaintiffs, the complaint plausibly alleges that Kyoko at least intended to be bound by her offer to refund plaintiffs' money.

*Second*, and in a similar vein, defendants argue the purported contract left an "essential term" undetermined and open to future negotiation because it suggested two different payment schedules (Dkt. No. 19 at 10). This order disagrees. Again, construed in the light most favorable to plaintiffs, the complaint plausibly alleges that Kyoko agreed to be bound by the material terms of the purported contract when she committed to refund plaintiffs' money with periodic payments (like the payments plaintiffs previously made) except that, if the financial performance of Serban's company permitted it, defendants would pay a larger sum.

In their reply, defendants cite *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793 (1998), for the proposition that "a contract cannot be formed with uncertain payment terms, as here" (Dkt. No. 22 at 6). *Weddington* reversed a trial court's order enforcing a purported settlement where the parties thereto had never reached a meeting of the minds as to numerous indisputably material terms of the settlement. *See* 60 Cal. App. 4th at 797–809. Significantly, *Weddington* expressly distinguished its own facts from situations where "minor matters" in contracts may be left for future agreement without rendering the entire contract unenforceable. *Id.* at 813. Here, it is unclear from the face of the complaint whether any matters arguably reserved for future agreement between the parties constituted material terms such that failure to agree thereon voids the purported contract underlying plaintiffs' claim. Accordingly, defendants' argument does not warrant dismissal at the pleadings stage.

*Third*, defendants argue that Mi Sook counteroffered instead of accepting Kyoko's offer, citing the July 15 email from Mi Sook to Kyoko (Dkt. No. 19 at 10). As stated, however, the complaint did not incorporate that email by reference. This order therefore does not consider it on the instant motion, although defendants remain free to raise this issue later on as this

11

litigation progresses. The complaint itself flat-out alleges that plaintiffs "accepted [defendants'] offer" to refund their money (Dkt. No. 1 ¶ 19). Again, for present purposes, the complaint as a whole adequately alleges formation of the contract underlying plaintiffs' claim.

*Fourth*, defendants argue that any rescission claim based on the alleged original contract for the purchase of the Balestrieri is time-barred under Section 339(3) of the California Code of Civil Procedure (Dkt. No. 19 at 10–11). As stated, however, plaintiffs' second claim for relief is actually for breach of an alleged new (refund) contract, not for rescission of the alleged original (purchase) contract. Defendants' argument is therefore inapposite.

### C. Declaratory Relief.

Defendants contend that (1) because plaintiffs' claim for declaratory relief adds "no new facts or legal theories," it is time-barred, and (2) leave to amend should be denied as futile (*id.* at 11–12). Plaintiffs do not respond except to "request leave to amend" (Dkt. No. 21 at 12). As stated, it is not clear from the face of the pleadings that plaintiffs' claims are time-barred. Dismissal with prejudice on this basis is therefore unwarranted.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **DENIED**. If plaintiffs nevertheless wish to amend their complaint, they may do so by **JUNE 26 AT NOON**.

**IT IS SO ORDERED.**

Dated: June 19, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE